& Co. I'm going to call on David Rosenfeld on behalf of Ironworkers Local 433, I'd like to reserve five minutes for rebuttal. Okay. The issue I want to address first is really the board's finding that it would have been futile for Sotaro Lopez to sign up on the union's out-of-work list. The board rests its case upon the finding that it would have been futile and says, in the support of that, that the reason that he didn't sign up was that it was unequivocal to him, and the union had made it unequivocal that he couldn't sign up. So I want to approach this case from testing that board's assertion buried in a footnote, which is where the board tends to bury its important statements in cases. The board, in footnote 4 at page 93 of the record, says, until that date, this is the last sentence in that left-hand column, and that date refers to September 5, 2000, when I sent a letter to Mr. Lopez saying you can register irrespective of this fine issue. I'm sorry to interrupt you. I want to read along with you. Where are you in your excerpts? Page 93, the bottom, left-hand corner, footnote 4. Okay. I'm with you. The first sentence is, unlike the judge, we are not persuaded by the mere fact that Lopez was allowed to register in November that he would have received the same treatment before September 5, when, of course, when he received my letter. Until that date, the Respondent had unequivocally informed Lopez that he would not be allowed to work because he had not paid his dues, and we find nothing in this record that might reasonably have caused Lopez to doubt that the Respondent meant what it said. And I'm prepared to test my theory on that statement by the board of unequivocality. The fact is that this problem began in August of 1999 when someone named the person told Mr. Lopez that as to his dues, they would be credited against the fine. When he goes into the local in January of 2002 to pay his dues, he talks to the office manager, a woman named Kim Taylor, and raises this question with her. She's the office manager. And she says to him, no, you pay your dues. You can still register. You can still go to work. It's not a problem. That was the finding of the administrative law judge who just briefly said when Lopez protested that he would not be able to work at all. Kennedy. Okay. Again, I want to read along with you. Where are you? This is at page 97 of the record, left-hand column, first full paragraph. So we're still reading out of the NLRB decision. I want to be careful. Left-hand column. Where are you in the column? Okay. It says, later in January, Lopez went to Local 433's office. Yes. On this occasion, Kim Taylor, Local 433's office manager, advised Lopez that any money he tendered would be applied against the fine balance. When Lopez protested that he would not be able to work, Taylor presented a copy of Cole's letter. That's a letter from the International Secretary-Treasurer, and assured him that working would not be a problem. At Lopez's request, Taylor provided with a copy of Cole's January 3rd letter, and then Lopez left without making any payment, or, in fact, registering to work on that day. And that letter that was very clear that he could work is part of the record. At page 3 was a letter addressed to James Butner, the financial secretary, early in January, saying you can apply this dues before fines, but remember, you got to let people work. You can't interfere with their work. So this Board finding that he'd been unequivocally told he couldn't work is, I think, plainly rebutted and lacks substantial evidence, given the fact what he was told in January. Did he need a dues receipt to take a job? The answer to that is the Board found that the union's policy was to have a dues receipt, but the Board does not assert that that was unlawful or improper. And that's sort of a critical problem here in that, is that the Board never alleged or asserted or pled a complaint or an allegation that to require people to have a dues receipt was unlawful. In fact, if you look at the general counsel's brief --" Kennedy, but isn't that a corollary of applying the payment to the fine first? That's what they're attacking. If you apply it to the fine first, you'll never get a dues receipt. Well, that's not necessarily so, because the letter says, in fact, the later receipts that Mr. Lopez got all reflected how he paid his money. In other words, he doesn't say he has to have a fully paid-up dues receipt. He says you have to show a dues receipt. And so you'll see, in fact, in the supplemental excerpt of the record, which is, as you remember, what happened was he sent a letter to the International Union in late July protesting what was going on, saying he knew that the International had to hold the local reform, but said the local isn't doing it. And he attaches to that excerpt at page 4 his dues receipts. So there's no reason to believe on this record that had he gone to the dispatcher and said, here's my dues receipt, they're crediting the fines against the dues against the fines. Dispatch me. There's nothing in the record that suggests he would not have been dispatched. But the receipt that he got when he comes in later and pays the dues on March 22nd, quote, prominently reflected that his dues were still paid only through October 99. That's right. So you're saying he can present this receipt that says he's overdue on his dues and still get work? What I'm saying in response to Judge Selden's question is that the Board never asserted and concedes in its brief, as the Board did in its decision, that this necessity of showing a dues receipt is not unlawful. What I'm saying is that a dues receipt that is incomplete or has an explanation or reflects some delinquency, the Board is not asserting and did not find would prevent him from being referred. Because if he goes to the dispatcher and says, here's my dues receipt, it shows a delinquency, the dispatcher can then inquire what the story is, what is the problem, is he entitled to dispatch. But Mr. Lopez, knowing there was this question, never sought to register and present that problem to the union saying, can I be referred or not? But didn't Mr. Lopez testify to the contrary? He said that he would not be able to be referred out if he didn't have a dues receipt. He didn't say he would be able to give an explanation. He didn't say that. His testimony was the opposite. His testimony was that he would have to have a dues receipt. But he had dues receipts. And he had a paid dues receipt. That's what he said, that he would have to have a paid dues receipt, not just a dues receipt. That's correct. But he had dues receipts showing what he had been --- what he paid and what his dues status was. Remember, he was never ---- Can't his testimony be fairly read as a current dues receipt? I'm currently paid up. Well, the Board never makes that finding because that wasn't the issue in the case. The issue was, did ---- I mean, from at least the Board's perspective, when it finally got there was, at least on the issue of futility, was, was it unequivocal to Sotero Lopez that he would not be able to register or ever be dispatched? And remember, the office manager tells him it's not a problem. You can be dispatched. You can work. The Board finds it. The judge found it. And I didn't get that far. But the Board's decision, which it issues after the administrative law judge issues a decision, makes the same finding, that she tells him you can work. Yet in January, when he's told that, he doesn't seek to register. He doesn't seek to register in February. He doesn't seek work in March. And remember, he comes in March to pay his dues. The office person tells him it'll be credit against your fines. He says, okay, that's in the record. He doesn't seek to register. He doesn't seek to register in April. He doesn't seek to register in May. In fact, never seeks to register until November. So he never comes to the union. And remember, the problem letter, the April 17th letter, which I agree is an artfully phrased and incorrect as applied to him, simply says that if you go suspended, you won't be eligible for referral. Keep in mind that he was never suspended. The Board found that there was no evidence he was ever suspended. So he certainly had to have in his mind a question. And that's all I think I have to convince this Court, is that the Board's finding that it was unequivocal to him, is not supported by the record, because he's told to the contrary in January. He comes to the local in March and never raises a question, doesn't seek to register. He gets Butner's letter of April 17th that says, if you go suspended, you can't register. The letter says, if you have any questions, call the local. He doesn't do that. When he files his charge on April 28th, he doesn't even claim that he isn't being dispatched. His initial unfair labor practice charge deals only with the fines and dues issues, not with not being dispatched. And then, finally the union ---- unequivocal message to Mr. Lopez that he would not be referred out. Is that how you characterize the Board's ---- I'm ---- the Board's decision rests upon the finding that, until that date, September 5th, the Respondent had unequivocally informed Lopez that he would not be allowed to work, because ---- That letter, the ---- what was it, the April 15th letter, whatever the last letter was, that was pretty unequivocal that you would be suspended and not allowed to work after April 30th. Well, but the next phrase, which Your Honor has to look at, says, and we find nothing in this record that might reasonably have caused Lopez to doubt. Right. That the Respondent. But we know what's in the record. He'd been told by the office manager that, notwithstanding this, he could still work, and we know that he made no effort to inquire about it. And then we know, in late July, when he finally writes the International, not the local union, doesn't send a copy to the union, he says to the International, well, you've told me I can work. The local doesn't seem to be following along, relying only on Butner's letter. What's the story? And the Board then faults the International for not responding, notwithstanding the fact that five weeks later, I wrote a letter to Lopez saying, this is nonsense, you can go to work. And he waits another two months to go to work. That's our standard of review. The standard of review is substantial evidence on the record as a whole. Right. It's universal camera. So how is that a standard for you to defeat? It's actually a low – it is a – it is a deferential standard, and I understand that. But it's – it's tested against the Board's reasoning. And the Board's reasoning here is – It's tested against the evidence in the record. The evidence – the substantial evidence is tested against the Board's rationale, which is – And the evidence in the record. True. And the evidence in the record is, without trying to belabor the point, that he was on notice, at least there had to be a doubt in his mind, given the fact what the office manager told him, given the fact that in March he would never raise the issue, and given the whole circumstances, which leads me to the second point in this whole case, which is, it seems to me, the real reason he wasn't registering was, in fact,  July of 2000, Mr. Lopez was seriously ill, suffering from memory loss, anemia, heart palpitations, high blood pressure, racing heartbeat, stomach problems, and diarrhea, and that, as the record shows, he suffered an accident in 1999, didn't work because of that, testified at the hearing he was seriously ill, and then in July of 2000, he gave an affidavit to the Labor Board in which he said those were his serious illness, which had caused him not to work, and that he was still suffering from that illness in July of 2000. And I can't stay in here imagining that anybody would imagine that someone could work as a welder on the ground or ten stories up if you have memory loss, anemia, heart palpitations, high blood pressure, racing heartbeat, stomach problems, and diarrhea. And when I began to then cross-examine Mr. Lopez further about that, the judge cut me off, as I point out in my brief, I think, quite obviously, assuming that given that kind of illness, no one would be working as an ironworker. Ginsburg. Well, the judge cut you off, but then at a later point, he allowed additional questioning on the disability status. He didn't allow additional questioning about the status of Mr. --" of his actual health. He just let me then confirm that that's what he said in his -- in his affidavit, so that the record was clear that he had said that. And what the Board does is applies, again, testing the substantial evidence. The Board, in a footnote, says, again, this is the footnote problem. This is on page 93, lower right. But before we leave that, didn't Mr. Lopez say he could still go to work? Because in our union, if you work 24 hours, disability does not count anymore. So wasn't the Board entitled to credit that testimony? Your Honor, what he -- Your Honor, what you -- the statement you read to me was, in your union, you could go to work. But he didn't say he could go to work. He never said after that, I was able to go to work, notwithstanding anemia,  But the Board could credit his testimony, could interpret his testimony differently than you are characterizing it. And it would be perfectly within its rights to do so, wouldn't it? Not on review, because if it's substantial evidence, and you cannot -- you can search the record, and there's no place where Sertoro Lopez said that in April, May, June, or July, I could have gone to work, I felt like I could work, my health was such that I could work. Is there anything in the record to the contrary, that he could not work doing that period? You tell us, articulate the symptoms, but there's nothing in the record saying that he could not perform the work during that time, either. The answer to that is that what the Board says, in terms of its standard, is that the fact that someone claims disability doesn't necessarily mean they can work. And that's why I wanted to just take a minute and dwell on that footnote, because that illustrates the problem I want to say sometime in rebuttal. In that footnote, bottom page 93, they rely on this export packing company case where a worker was a deaf, mute, and worked for a packing company, and then the successor comes in, doesn't hire him because of union activity, and says, the successor, we couldn't hire him anyway because he was disabled. And the Board said, that's silly, because he worked for your predecessor, even though he was deaf and mute. The case has no bearing here, because here you've got Sertoro Lopez, who not only says he has all these serious illnesses, he files a claim with the union for disability under the Pension and Health and Welfare Plan, and his doctor certifies that he is disabled at least pending through April 3 of 2000. The record shows that he had filed a claim for disability, claiming he was disabled, receiving disability benefits in the pension, and the doctor had certified that he had a pending claim for permanent disability through April. Ginsburg. Counsel, but Mr. Lopez said that he did that, but he did it only to extend his hours because he couldn't work or register because he didn't have a dues card. That's his testimony. His testimony was never, because he was — if he had said at that point, yes, I felt fine, this is all a lie, he would have understood the fraud of what he'd done. So he was — he never said, Your Honor, I could have worked, that these illnesses had subsided. He simply said, in response to my question, in his sworn affidavit to the board, he assured the board in July he was still suffering from these illnesses, but he never said, you can search the record, Mr. Fleischer can search it. He never said, by June, July, August, I felt well enough to go back to work, and none of these illnesses would have stood in my way to climb up a girder 40 stories up and weld that I didn't have diarrhea and stomach pain. And there are welding jobs on the ground, too. Or on the ground, either. Well, the board seems to think that he testified to the effect that he could. At page 93 in the right-hand column, the board says he testified that he could have taken a job at that time and, quote, they would have torn up the disability. That's — that's right. But when you read what the board says is parroting his words, which is that the pension, if he goes to work, would tear up his disability because then they're not going to pay him disability, he doesn't say. And just to conclude this, when that question is in the record, Your Honor, and you can find it, and that's at page — he specifically asked that question, and he says, yes, they would tear it up, but he does not say, and I was prepared to go back to work. I was healthy enough to go back to work. And that's the problem. The judge cut me off because I was going to, you know, pursue that further. Ask him, as of July of 2000, well, what was the state of your health? The judge said, I heard enough, because the judge in one sentence says, well, based on my findings, he plainly was still too ill to go back to work. Okay. Let's go to the other side, and you've got some time for rebuttal. Thank you. May it please the Court, my name is David Fleischer, representing the National Labor Relations Board. Basically, what this case is about is that a union tried to enforce a fine the wrong way. The right way to enforce a fine is by going to court and getting it enforced. And instead, they tried to use their dues collection, where they have a union security clause to threaten a person's job, which you can't do. Now, the question, or now, I would note first that we are, as far as the violation is concerned, we are talking about a narrow time period from the end of April until September 5th, when Mr. Rosenfeld wrote his letter. The violation of refusal to refer is found only for that time period. The end of the fact that they told him in January that he could still be referred does not fall within that time period. And our position is that what they told him in January was essentially negated by what the local business manager, who was much closer than the international to the referral process, told him in April in a letter. And I would note in this regard the Mr. Lopez's testimony that is most significant is in a colloquy with the administrative law judge on page 47. First, Mr. Rosenfeld asked, You didn't go to the hiring hall to put your name on the out-of-work list in January 2000, did you? Answer, Because I could not go to work, it would be senseless. The judge interjects, Well, when you say you couldn't go to work and it would be senseless, Lopez, Well, I mean, I could not go to work because I would not be dispatched out to work anyway, even if I was physically able to work. Judge Schmidt, why, Lopez? Because I have to give them my current dues receipt, and then they give me my work order. Now, current dues receipt, the normal meaning of the word current is means paid up to now, not paid up to six months ago, and you owe them dues for the last six months. The union offered no evidence that current had the latter meaning, and there are several other points which many of which are reflected in our brief where the union at least theoretically might have offered evidence that would justify findings contrary to the ones made by the board, but it never attempted to. On the matter of disability is one of them. The letter from Mr. Butner to Mr. Lopez in April, which is the heart of the violation, says nothing about disability claim pending before the union, and so the union was on notice that there was at least an issue as to whether he was disabled or not. Neither that letter nor any other communication said, if you want us to refer you, you've got to show us that you're physically able to do some work. It is also significant that when, in November of 2000, Lopez finally did register, there is no evidence that the union questioned his physical ability then. It referred him out to jobs after that, and there's no evidence that it questioned his physical ability before referring him out. And what do we know about his working when he's referred out? We don't know anything, actually. The record doesn't show what kind of jobs he was referred to. But the union's not putting anything in that says he didn't perform them or he was unable, he was having trouble. We just don't know. There's nothing in the record to suggest any of that. And in this regard, I would suggest that the disability issue is like a right-line defense for an employer where if the board shows that an employer was motivated by union activity in firing someone, it's not enough for the employer just to show that there was some other good reason for firing him. It has to show that it would have fired him for that reason, even if he had nothing to do with the union. Okay. Let me ask you this. Let me focus on the footnote with which Mr. Rosenfeld began. That's to say footnote 4 on page 3 of the board's order, where the board writes, until that date, that is to say until September 5, responded, had unequivocally informed Lopez that he would not be allowed to work because he had not paid his dues. Well, I have to say that statement doesn't really hold up, even based upon what the board says in the text about the nature of the evidence. For example, when he goes in to see the office manager in January, she says it's not a problem. Now, it may be that he had a general impression that there was going to be a problem, and there was some indication that he was going to have a problem, but that letter on April 17th says if we do not receive a payment on or before April 30, you will go suspended. If your membership goes suspended, you will not be allowed to work. It doesn't say you will not be allowed to work because you haven't paid your dues. It says if you're suspended. What do I do with this? Well, the letter suggests that suspension would be automatic if they hadn't received a payment of dues, which given their fines before dues amounted to a payment of his whole  And this is the end. Yeah, but even if we read that letter as saying you will not be allowed to work until you've been reinstated, all that says is we're threatening you with reinstatement unless you pay your dues. We're threatening you with suspension. And unless you pay your dues pronto, we will suspend you. But that doesn't say as to the period up until now when you've not been suspended that you can't work. Well, the letter has to be understood as an objectively reasonable layman in Mr. Lopez's position would have understood it and not how an experienced labor lawyer would have understood it. Well, what I'm after is the board statement in the footnote that says the respondent had unequivocally informed Lopez. I just don't see that that's supported by the evidence in front of us. Do we need a statement? Do we need a conclusion that he was unequivocally informed? Well, although I would suggest that that letter standing alone would be unequivocal from our position is that even if it were somewhat ambiguous, the burden of correcting ambiguities in a situation like this is not on the employee, but on the union, which created any ambiguity in the first place by sending him this letter. And OK, now maybe you can help me on this one. And if I knew the case a little better, maybe I could do this. And it says until this day, I understand the entail. That's very clear. September 5. But when's the starting point for that period about unequivocal? Well, our starting period is April 30th, because although the letter from Butler was dated April 17th, for one thing, the complaint only alleged April 30th. So procedurally, the board could not have found an earlier date. But beyond that, the letter imposed a deadline of April 30th and therefore did not say he couldn't get the. So so the disputed period runs only from April 30th till September 5th. So your answer to what the office manager said in January is, well, that's neither here nor there, because on April 30th, he is suspended. Yes, I mean, the office manager's statement is not at a time when there is any finding of refusal to refer. Yeah. OK. And anyway, to to return to my point, what Mr. Lopez was experienced in and was how the hiring hall operated, and he testified at least two times that I know about, which are page 47 of the excerpts of record and also page 53. He'd been working at the higher working out of the hiring hall for 20 years because this union, as far back as anyone knows, used an exclusive hiring hall and you couldn't get a job without being referred. And through his 20 years experience, he said he knew you couldn't get referred without a current dues receipt. The union, again, offered no evidence that anything less than the current up-to-date dues receipt would do the job. Unless there are any further questions, although I have several minutes left, I will submit my case. Okay. Your several minutes will be gratefully received. Thank you. Thank you. Mr. Rosenfeld. Your Honor, you asked Mr. Fleischer about what date do we look at. And, yes, if you want to look at sometime roughly after April 17th when the button and letter was received, only that period, the Board's case stands on a more solid footing. But the Board can't ignore the substantial evidence of record that in January the office manager expressly told him he could not. But let me ask you this. Why is it not the relevant period after April 30th? Isn't this dispute in terms of any remedy he's seeking April 30th onward? That's right. But the question is, as of April 30th, what's he know? What has been unequivocally stated to him at that time? That's right. And we know that he gets a letter from Butner that says, if you have any questions, call me. We also know on the record that he was never suspended. But more importantly for my argument, we know that he knows when he gets the Butner letter. Well, wait a minute. I'm just reading from the Board. On April 30th, Local 433 suspended Lopez's membership. No. To the contrary. The Board — Is that just wrong? Your Honor, take a page 93, lower right-hand corner. The ALJ found that he was suspended. I took exception. The Board reversed it. Lower right-hand corner, .3. There's no evidence that Lopez was suspended. The judge found that Respondent suspended Lopez in exception. Respondent argues there's no evidence. We agree. They reversed that finding. There was no evidence he was ever suspended. Well — Oh, I am sorry. I'm flipping back and forth between the Board and the jury. We all do this. I'm sorry. That's my fault. So the fact is, A, he was never suspended. B, Your Honor is correct. He got the Butner letter. But I keep — I will conclude by saying, in January, he was told to the contrary. The Board found that. ALJ found that. The record is clear that he knew that it could work. He'd been told that. So I concede that if the Board had said there was an ambiguity, it wasn't clear. The burden is on the Respondent to explain the ambiguity. I think, in response to Judge Wallace's question, I have a tough case here. But the Board didn't do that. They rested on a different theory, that it was unequivocal to him in April. And the reason they rested on that was because they knew they were trying to undermine or deal with this problem, that he'd been told by the office manager he could work, and given the letter from the International assuring him that he could work. Thank you. Thank you. Thank you very much for useful arguments on both sides. NLRB v. International Association of Red Structural and Ornamental Ironworkers is now submitted for decision, and we are in adjournment for the day and for the week.
judges: W. Fletcher, Rawlinson, Selna